IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JOHN PERKINS,<br>              *Defendant*. | Criminal Action<br><br>No. 19-cr-269-7 |

Goldberg, J.                                                                                                                February 18, 2022

### MEMORANDUM OPINION

This case arises from a conspiracy resulting in a kidnapping and murder. Defendant John Perkins seeks to suppress statements he made during an interview with federal agents in which he was questioned about the kidnapping. The issues currently before me are: (1) whether Perkins was in custody; (2) whether he was advised of his Miranda rights before questioning began; and (3) whether he knowingly and voluntarily waived those rights. For the reasons that follow, the motion to suppress will be denied.

**I.     BACKGROUND**

On May 9, 2019, Defendant John Perkins was charged with: (1) Conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) (Count one); and (2) Kidnapping involving interstate commerce and aiding and abetting, in violation of 18 U.S.C. § 1201(a)(l) and (2) (Count two). Perkins is alleged to have participated in a conspiracy with multiple other defendants to kidnap an individual and hold him for ransom. The victim allegedly stole drugs from several members of the conspiracy, and their plan was to hold him hostage in exchange for money to compensate them for the stolen drugs. The victim was kidnapped, violently beaten, and eventually fatally shot.

1

Perkins was questioned by federal agents about his potential involvement in the kidnapping while he was incarcerated on unrelated charges. The statements Perkins made during that interview are the subject of the motion to suppress pending before me.

## II.   FINDINGS OF FACT

On January 10, 2022, I held a hearing on Perkins's Motion to Suppress, where the Government presented the testimony of Special Agent Brian Hefner. Mr. Perkins testified as well. Perkins argues that he was in custody when he was questioned by federal agents and that his Miranda rights were implicated. He also claims he was not advised of his Miranda rights before the questioning began. The Government disagrees, asserting that Perkins was not "in custody" and that in any event, Agent Hefner advised Perkins of his rights both orally and by presenting him with an FBI FD395 "Advice of Rights" form, which he refused to sign.

Based on the evidence presented during the hearing, and upon review of the parties' briefs (ECF Nos. 284, 304, 317), I find the following facts:

1. In August of 2018, approximately two months after the alleged kidnapping and murder, Perkins was arrested for a drug charge in an unrelated case. As a result, a parole detainer was lodged, and Perkins was eventually housed as an inmate at SCI-Phoenix. (Govt. Resp. to Mot. to Supp. at 5-6, ECF No. 304).

2. While Perkins was incarcerated, federal agents met with his romantic partner, Salima Wilds, as part of their investigation into the kidnapping. Ms. Wilds was the registered owner of a 2007 Blue Volkswagen Passat that was seen on surveillance footage on the day of the kidnapping at the 2000 block of North Orkney Street, where the kidnapping occurred. Federal agents confirmed with Ms. Wilds that the car in the surveillance video looked like her car, and that it was typical for Perkins to drive her car during the day while she was at work. Ms. Wilds also confirmed that a phone number that was in communication with other identified members of the conspiracy belonged to Perkins. (Supp. Hr'g Tr. 34, 48, Jan. 10, 2022.)

3. Based upon this information, federal agents attempted to locate Perkins and learned that he was being held at SCI-Phoenix. On October 31, 2018, Agent Hefner and FBI Task Force Officer Anthony Vega traveled to SCI-Phoenix to interview Perkins about his knowledge of the kidnapping. (Id. at 49.)

4.   On that date, Perkins was escorted by a prison guard from his cell to a small utility room where the agents were waiting to conduct the interview. Upon his arrival to the utility room, the prison guard removed Perkins's handcuffs and shackles. Upon entering the room, the door locked behind him, as indicated by a buzzing sound that would be triggered before and after the door opened and shut. (Id. at 52, 96, 98, 120.)

5.   When Perkins arrived, the agents identified themselves as law enforcement and explained that they were there to talk to him about the June 19, 2018 kidnapping. The agents also told Perkins that he was free to leave the room at any time. Before questioning began, Agent Hefner presented Perkins with an FBI FD395 "Advice of Rights" form and orally advised Perkins of his Miranda rights. Perkins refused to sign the form, stating "he did not need to sign anything because he had not . . . murdered or kidnapped anyone." Agent Hefner did not keep the form that he claims he presented to Perkins. (Id. at 54-57, 75, 100.)

6.   The agents continued to ask Perkins questions about the kidnapping, and specifically whether he recognized photographs of particular members of the conspiracy. Perkins denied recognizing any of the photographs of his co-defendants. Perkins responded to almost every question with a version of the following phrase: "I do not have nothing (sic) to say. . . Can I leave?" He recalled asking if he could leave approximately 8-12 times. (Id. at 61, 103, 105, 143, 146-147.)

7.   Perkins testified that Agent Hefner got frustrated with him and began raising his voice. Agent Hefner also allegedly threatened Perkins, stating "Who's [the grand jury] going to believe? . . . Me or you?" Agent Hefner continued, stating "[Y]ou're going to get 20 years. You're going to go to jail for 20 years, because all these guys blaming (sic) you[.]" The Government presented no evidence to rebut these facts. (Id. at 105.)

8.   At the conclusion of the interview, Perkins stated that he had nothing else to say and he was escorted back out of the room by the prison guard. The entire interview lasted approximately 20-30 minutes. (Id. at 63.)

III.  **LEGAL ANALYSIS**

   A.   **Was Perkins in Custody During the Questioning?**

Under Miranda v. Arizona, law enforcement is required to provide warnings to an individual when they are "taken into custody or otherwise deprived of [their] freedom by the authorities in any significant way and [are] subjected to questioning." United States v. Ludwikowski, 944 F.3d 123, 131 (3d Cir. 2019). In determining whether a person is "in custody"

for Miranda purposes, the first step is "to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 565 U.S. 499, 509 (2012) (internal quotations omitted). Relevant considerations include the location of the interrogation, its duration, statements made during the interview, whether the individual was physically restrained during questioning, and the release of the individual at the conclusion of questioning. Id. The ultimate inquiry should focus on "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Id.

An interrogation is not automatically custodial simply because it takes place in a prison. Burkholder v. Newton, 116 F. Appx. 358, 361 (3d Cir. 2004). Rather, Miranda warnings are required for prisoner interrogations "only when there is a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." Id. (quoting United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985)). "Such a change in surroundings could include the imposition of handcuffs or being taken to a locked room to be questioned by correctional officers." Id.

Despite the fact that the questioning took place in a prison, inside a small, locked utility room within that prison, the Government does not concede that the questioning was "custodial." Rather, the Government notes that "[t]he fact that law enforcement interviewed the defendant while he was incarcerated for an unrelated matter does not by itself provide a basis for a finding that he was in custody for the purposes of Miranda." (Govt. Resp. to Mot. to Supp. at 7). The Government urges that many of the factors courts consider in the custody analysis under Miranda weigh in favor of a non-custodial interrogation. For example, Perkins was not handcuffed or restrained in any way during the interview and was reassured that he could leave and return to his

4

cell at any time. And while Perkins's freedoms were certainly restricted, the Government submits that those restrictions were a product of his being an inmate at a correctional facility, and "were not placed upon him by investigating agents." Id.

I find that Perkins was in custody for Miranda purposes when Agent Hefner and Detective Vega questioned him about his potential involvement in the kidnapping at SCI-Phoenix. The circumstances of Perkins's interrogation, when considered as a whole, clearly presented the "inherently coercive pressures" at issue in Miranda. These circumstances included the fact that Perkins was escorted from his cell to a separate interview room wearing handcuffs and shackles and did not go there voluntarily. While this is a typical practice in prisons, the absence of choice and freedom of movement suggests the interrogation was custodial. Furthermore, when he arrived inside the room, the room was locked.[1] Agent Hefner confirmed that when Perkins finally did leave the room, he needed to be escorted out by the prison guard who stood by the door during the interview.

In addition to the restrictions on Perkins's movement during the interview, I find that Agent Hefner's comments could have created a coercive environment. Perkins testified to specific threatening statements made by Agent Hefner during the interrogation, in which he stated, "you're going to get 20 years," and "who's the grand jury going to believe, me or you?" (Supp. Hr'g Tr. 105, Jan. 10, 2022.) These unrebutted statements could have created the kind of coercive environment Miranda warnings were designed to protect against.

Finally, I am not persuaded by, nor do I understand the Government's argument that the interrogation was not custodial because the restrictions on Perkins's movement "were not placed

---

[1]   Perkins testified to this fact, which was not contradicted by the Government. (Supp. Hr'g Tr. 98, Jan. 10, 2022.)

5

upon him by investigating agents." The ultimate inquiry is not who put the restrictions in place, but rather, taking all of the features of the interrogation into account, whether the individual being questioned would reasonably believe they were free to leave. Howes, 565 U.S. at 509. I find the restrictions on Perkins's movement would lead a reasonable person to believe they could not terminate the interview.

### B. Waiver of Miranda Rights

Before a custodial interrogation begins, "law enforcement must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to have counsel present ... if [he] so desires." United States v. Almonte, 348 F. Supp. 3d 402, 407 (E.D. Pa. 2018) (internal quotations omitted). It is the Government's burden to prove, by a preponderance of the evidence, "that a defendant was advised of his/her rights and voluntarily and knowingly waived them." Id. (quoting U.S. v. Lin, 131 F. Appx. 884, 886 (3d Cir. 2005)). Waiver can be explicit or implicit. A defendant can explicitly waive their Miranda rights by, for example, signing a form acknowledging they are aware of their rights but are choosing to speak with law enforcement anyway. Waiver can also be implied based on the defendant's conduct. United States v. Cruz, 910 F.2d 1072 (3d Cir. 1990). "Verbal statements by a suspect acknowledging an understanding of his Miranda rights followed by the suspect's answering questions can qualify as an implicit waiver of protections, thus satisfying the constitutional safeguards established in Miranda." United States v. Harris, No. CRIM. 08-058-SLR, 2008 WL 5328843, at *4 (D. Del. Dec. 22, 2008).

Courts must presume that a defendant did not waive his or her rights. North Carolina v. Butler, 441 U.S. 369, 373 (1979). This presumption can be overcome, however, with evidence showing that warnings were provided and that a waiver was made. Almonte, 348 F. Supp. at 408.

The Government may prove that a defendant was advised of their rights by offering "testimony of the interrogating police officer, any audio or video recordings of the interrogation, and/or a Miranda waiver form, when available. Officer testimony that demonstrates that a suspect was properly advised of his rights and that a proper waiver was obtained, when credible, can be sufficient on its own; no physical form or signature need be produced." Id.

During the suppression hearing, Perkins testified that the agents did not present him with an Advice of Rights form at any point during the interrogation. He also stated that he was not orally read his rights. As mentioned earlier, Agent Hefner did not preserve the Advice of Rights form that he allegedly presented to Perkins at the beginning of the interview, and consequently there is no documentation corroborating Agent Hefner's assertion that he did in fact read Perkins his Miranda rights.[2] Agent Hefner acknowledged he has preserved documentation of these incidents on other occasions. In fact, Agent Hefner interviewed Perkins again on May 15, 2019, after Perkins was arrested on the charges related to this case. During this subsequent interview, Perkins refused to speak with Agent Hefner after he read him his rights. Agent Hefner documented this refusal by writing "refused" on the form, and then maintained it in law enforcement's filing system. (Supp. Hr'g Tr. 70-71, Jan. 10, 2022.)

Agent Hefner testified differently, stating that he "presented and advised" Perkins of his rights by providing him with the Advice of Rights form to sign and that he read the form aloud. According to Hefner, Perkins refused to sign the form, stating that "he did not need to sign anything because he had not . . . murdered or kidnapped anyone." (Id. at 55-57.) Agent Hefner then continued to ask Perkins questions.

---

[2] Agent Hefner testified that he memorialized the details of the interview in an FBI "302" form. (Supp. Hr'g Tr. 60, 76, Jan. 10, 2022.) I note that the Government never requested that the 302 form be moved into evidence, and therefore it cannot be considered.

7

Keeping in mind that the Government's burden of proof is only by a preponderance of the evidence, I find that Perkins was advised of his rights at the beginning of the October 2018 interview. While the Government failed to produce documentation corroborating Agent Hefner's testimony, they were not required to do so. No physical form or signature needs to be produced to prove that a defendant was advised of their rights. And based on my assessment of Agent Hefner's demeanor, I find the entirety of his testimony reading the Miranda rights to be credible.

Upon finding that Perkins was advised of his rights, I must determine whether Perkins knowingly and voluntarily waived those rights by choosing to speak with the agents. When determining whether a defendant's waiver was voluntary, courts engage in a totality of the circumstances analysis. United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994). The potential circumstances include whether there was police coercion, the length and continuity of the interrogation, the defendant's maturity, physical condition, and mental health, and whether law enforcement advised the defendant of their rights. Id. The defendant's background and experience within the criminal justice system may also be considered. United States v. Rought, 11 F.4th 178, 187 (3d Cir. 2021). A statement is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" and the defendant's will was not "overborne." Swint, 15 F.3d at 289. The Third Circuit has held that a confession can only be found involuntary if it was "the product of police overreaching." Id. Waiver must also be made knowingly, which means the defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).

I find that Perkins made his own independent assessment of the consequences of responding to the agents' questions, and thus his statements were voluntary. I note that Perkins is not a stranger to the criminal justice system, and he testified to his knowledge of his right to remain

8

silent and to refuse to answer the agents' questions. (Supp. Hr'g Tr. 149-150, Jan. 10, 2022) (Q: Okay, so you knew that you didn't have to speak to these Officers? . . . A: Yeah."). There is also no evidence of police misconduct that would rise to the level of "overreach" necessary to render a statement involuntary. While Agent Hefner's statements regarding the amount of incarceration Perkins was facing were troubling, I find that such statements were not intimidating enough such that Perkins's will was completely "overborne." See United States v. Rutledge, 900 F.2d 1127, 1131 (7th Cir. 1990) ("The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible."). Overall, the circumstances suggest that Perkins had a full awareness of the nature of his rights and the consequences of his decision to abandon them. For these reasons, I find that Perkins's statements were voluntary, knowing, and intelligent under the totality of the circumstances.

## IV.    CONCLUSION

For the reasons set forth above, Perkins's Motion to Suppress Statements will be denied. An appropriate order follows.

**BY THE COURT:**

**/S/MITCHELL S. GOLDBERG**
**MITCHELL S. GOLDBERG, J.**