IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *v.* | **Criminal Action** |
| **JOHN PERKINS** | **No. 19-cr-269-7** |
| *Defendant.* | |

**Goldberg, J.**                                                                                    **September 18, 2023**

## MEMORANDUM OPINION

This case involves a conspiracy wherein several drug dealers kidnapped, tortured, and eventually killed another drug dealer who stole drugs from several members of the conspiracy. To recoup their losses, the conspirators lured the victim into an empty house and held him hostage in an attempt to obtain ransom payments from his family members and business partners. Certain members of the conspiracy eventually drove the victim to Maryland, shot and killed him, and left his body in the woods. Seven defendants were charged with conspiracy to commit kidnapping (Count One) and kidnapping involving interstate commerce resulting in death (Count Two), and some were charged with related firearms offenses.

Defendant John Perkins was the only defendant to proceed to trial.[1] On March 24, 2022, following a two-week trial, the jury convicted Perkins on Counts One and Two. Pending before me is Perkins's Motion for Entry of Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29, where Perkins argues that the evidence was insufficient to sustain a conviction on either count. For the reasons that follow, the motion will be denied.

---

[1]        Of Perkins's seven codefendants, six pled guilty prior to trial, and one (Fermin Mejia) passed away. (ECF No. 275).

**I.**      **Procedural Background**

On May 19, 2019, Defendants Ivan Rangel Prieto, Jose Castillo, Jose Bernal, Jose Delgado, Salvador Sanchez-Guerrero, Robert Favors, John Perkins, and Fermin Mejia were charged with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c) (Count One), and kidnapping involving interstate commerce resulting in death, and aiding and abetting, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Count Two). Each Defendant played varying roles during the course of the conspiracy.

Perkins filed several pretrial motions seeking the suppression of evidence.  First, he moved to suppress physical evidence obtained from the search of his cell phone, arguing that law enforcement did not have probable cause to seize and search the phone.  I denied that motion, finding that probable cause for the search was established through a twenty-five-page affidavit which outlined extensive facts suggesting that evidence of the kidnapping would be found on the phone.  (ECF No. 322).  Perkins additionally sought to suppress statements he made during an interview with federal agents in which he was questioned about the kidnapping.  I denied the motion after a hearing, finding that the Government proved that Perkins was advised of his Miranda rights before the interrogation, and that he knowingly and voluntarily waived those rights. (ECF No. 344).

At the close of the Government's case, Perkins made an oral motion for a judgment of acquittal on all counts.  As Rule 29(b) permits, I reserved decision on the motion.  Perkins renewed his motion after the guilty verdicts were rendered and filed his brief in support of the motion on April 25, 2022. (ECF No. 411).

II.      **Factual Background Established at Trial**

The evidence presented by the Government relevant to Perkins's current motion is as follows:

Prior to June of 2018, the victim, Alejandro Ramon, refused to pay for large quantities of cocaine

obtained from at least one of the defendants.  For this reason, several members of the conspiracy

joined together to locate the victim and recover the money owed.  Salvador Sanchez-Guerrero

recruited defendant Robert Favors, through his adult son Enoch Sanchez,[2] to assist them in the

kidnapping.[3]  Favors and Enoch Sanchez knew each other from work.  Favors then recruited his

cousin, Defendant John Perkins, to assist as well.  Favors and Perkins agreed to act as the "muscle"

if things became violent when the defendants confronted the victim to recover the debt.  In return,

Prieto and his associates agreed to supply Favors and Perkins with drugs to sell in the future.  (N.T.

3/18/22 at 6:12-18:14, ECF No. 386; N.T. 3/16/22 at 22:12-32:18, ECF No. 377; N.T. 3/24/22 at

7:24-21:3, ECF No. 384).

On June 8, 2018, Prieto, Bernal, Castillo, Salvador Sanchez-Guerrero, Enoch Sanchez, Favors,

and Perkins met at a restaurant in Philadelphia to discuss the plan to kidnap the victim.  Perkins

attended that meeting.  Enoch Sanchez translated the conversation—which was primarily between

Prieto, Favors and Perkins.  Prieto spoke Spanish and a little bit of English.  Neither Favors nor

Perkins speak Spanish.  (N.T. 3/21/22 at 103:2-105:8, ECF No. 400; N.T. 3/18/22 at 13:18-15:12,

ECF No. 386).  Perkins's co-defendants offered somewhat conflicting testimony regarding the

conversation that occurred at the restaurant.  Below are summaries of the relevant testimony from

each witness:

   1. ***Ivan Prieto's Testimony -*** Co-conspirator Ivan Prieto testified that at the restaurant
      meeting, he told Perkins and Favors that they were "looking for [the victim] because he
      owed [them] some money," and "[they] wanted to kidnap [the victim] in order to try to get
      the money." Prieto testified that Favors and Perkins agreed to "help [them] out."  Payment

---

[2]      Enoch Sanchez was not charged in the present Indictment.
[3]      Salvador Sanchez Guerrero and Enoch Sanchez will be referred to by their full names for clarity.

in exchange for this assistance was not discussed at the restaurant, but Salvador Sanchez-Guerrero later told Prieto that Favors and Perkins would be compensated with $5,000. (N.T. 3/16/22 at 37:10-39:8, ECF No. 377).

On cross-examination, Prieto said that at the restaurant, he used the word "catch," not "kidnap." (Id. at 111:1-4).

2. ***Jose Bernal's Testimony -*** Co-conspirator Jose Bernal testified that the purpose of the meeting was "to get some more help because Prieto thought he needed more people to come along and do this kidnapping." Prieto told Perkins and Favors that the victim was going to be kidnapped because "[he] had been stealing drugs." When asked if Favors and Perkins's role in the kidnapping was discussed at the meeting, Bernal testified, "Well, yes. You know, help us – help us kidnap, help us grab him so everything, you know, would turn out right from the very start." Bernal stated that Favors wanted $15,000 to participate in the kidnapping. (N.T. 3/24/22 at 21:4-22:18, ECF No. 384).

On cross-examination, when told that Prieto testified the word "kidnapping" was never used, Bernal initially said that Prieto's assertion would not be a lie. Bernal explained, "[i]n Spanish we don't use that word. We use a different word. We don't use kidnapping as such. But in English there is no other word for kidnapping except that." He later said "we talked -- we talked about picking up the person in Mexico. That's how we use it. Here it's kidnapping." He later concluded that the exact word "kidnapping" was in fact used, but he was not sure whether it was Prieto or Enoch Sanchez who used the word. He also stated that if Prieto and Enoch Sanchez stated that the word "kidnapping" was never used during the conversation, that they were lying. (Id. at 60:9-63:17).

3. ***Robert Favors's Testimony -*** Robert Favors testified that at the restaurant meeting, Prieto said that he wanted to "get this mother f****er," referring to the victim. Favors understood that in exchange for helping Prieto "recover his money," Prieto would become his drug supplier for future narcotics trafficking. Favors explained that his role at Orkney Street, along with Perkins, was to be the "muscle" and possibly use violence to hold the victim until the victim's business partner came with the money. (N.T. 3/18/22 at 15:13-16:14, ECF No. 386; N.T. 3/21/22 at 31:2-32:25, ECF No. 383).

Favors testified that he did not know that Prieto and his associates were going to hog tie the victim and eventually kill him. He testified that that was not his plan, nor Perkins's plan. (N.T. 3/21/22 at 30:11-17, ECF No. 383).

4. ***Enoch Sanchez's Testimony -*** Enoch Sanchez, who translated the conversation at the restaurant between Prieto, Favors and Perkins, testified that Prieto told Favors "they needed help finding someone." When asked to elaborate, Enoch again responded, "that he just needed help finding him[,]" and "[t]hey were looking for a person that, you know, had tooken [sic] something from them." And Favors responded that "[h]e would look into it." (N.T. 3/21/22 at 105:9-108:4, ECF No. 400).

4

When asked whether there was a discussion about what the men planned to do with the victim once they found him, Enoch testified "[j]ust that we're going to look for him and that's about it. That's the conversation that happened at the [restaurant]. It's about finding the individual." (N.T. 3/21/22 at 109:16-22, ECF No. 400).

Prieto eventually located and contacted the victim. On June 19, 2018, approximately ten days after the restaurant meeting, Prieto and Castillo scheduled a meeting with the victim under the ruse of viewing potential locations for drug trafficking. Prieto was able to communicate with the victim and organize the meeting without tipping off that it was a ruse to recover the debt because the victim did not steal from Prieto directly, and the two men did not know each other. Rather, the victim stole from Jose Bernal who was selling drugs for Prieto at the time. (N.T. 3/24/22 at 8:2-9:21, ECF No. 384).

On June 19, 2018, certain defendants met in a location on Oxford Avenue beforehand and distributed supplies for the kidnapping including guns, gloves, and walkie-talkies and then drove to the location at 2019 Orkney Street where Prieto and Castillo were to meet the victim. Prieto, Castillo, and Delgado drove in a Lincoln Navigator, while Bernal and Salvador Sanchez-Guerrero drove in a Lexus. Defendant Perkins, Favors, and their cousin Rasul Maven (now deceased) drove in a Volkswagen Passat. The victim entered the Orkney Street house first, followed by Prieto and Castillo, and later Delgado, Bernal, Salvador Sanchez-Guerrero, and Maven. Perkins and Favors waited in their car outside the house while the victim was being beaten, shot, gagged, and tied up in the house. Eventually, Favors and Perkins entered the house and, at Castillo's direction, Favors and Perkins helped load the victim into the trunk of the Lincoln Navigator in the garage. After the victim was loaded into the Lincoln Navigator, the defendants left the Orkney Street location in multiple vehicles. (N.T. 3/21/22 at 24:10-36:17, 43:20-44:8, 48:21-49:18, 56:5-61:20, ECF No. 386; N.T. 3/24/22 at 4:21-5:2, ECF No. 383).

Perkins, Favors, and Maven's involvement ended after they left the Orkney Street location. From there, the victim was driven by others to a location in Chester County where Prieto, Castillo, Bernal, Delgado, and Salvador Sanchez-Guerrero made ransom calls, demanding money for the victim's release.   Favors, Perkins, and Maven did not travel to the location in Chester County. Later in the evening, the victim was taken to Maryland, where he was shot and killed. Perkins, Favors, and Maven did not travel to Maryland.   (N.T. 3/24/22 at 42:23-47:25, ECF No. 384).

### III.    Legal Standard

Federal Rule of Criminal Procedure 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . . If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  A motion for a post-verdict judgment of acquittal requires the court to "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The court must "draw all reasonable inferences in favor of the jury verdict."  United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996).  "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury."  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

A defendant bears an "extremely high" burden when challenging the sufficiency of the evidence supporting a jury verdict.  United States v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008) (quoting United States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005)).  "Thus, a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'"  United States

v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

## IV.     Discussion

Perkins maintains he was never aware that his codefendants planned to kidnap the victim. Rather, Perkins believed he was going to be present for a meeting between Prieto and the victim where a drug debt was to be repaid, and Perkins would be available to assist in the event that the victim became violent.  And in return, Prieto would become Perkins's and Favors's narcotics supplier.  Consistent with this theory, Perkins argues that the evidence presented at trial was insufficient to support a conviction for either the kidnapping charge (Count Two) or the conspiracy charge (Count One).[4]

### A.  Challenge to the Sufficiency of the Evidence – Kidnapping Involving Interstate Commerce, and Aiding and Abetting (Count Two)

"A person is guilty of federal kidnapping who (1) 'unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away' any person, (2) 'holds [the victim] for ransom or reward or otherwise,' and (3) travels in interstate commerce or makes use of any instrumentality of interstate commerce 'in committing or in furtherance of the commission of the offense.'" United States v. Rivera, No. 19-cr-391, 2023 WL 3294847, at *2 (E.D. Pa. May 4, 2023) (quoting 18 U.S.C. § 1201(a)).  The federal aiding and abetting statute states that "whoever . . . aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States], is punishable as a principal."  18 U.S.C. § 2.  To be convicted of aiding and abetting, it must be established that the defendant (1) took an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission.  Rosemond v. United States, 572 U.S. 65, 71

---

[4]     I address Perkins's challenges to his counts of conviction in the order in which he presents them in his Motion.

(2014).  This intent requirement "extend[s] to the entire crime," and thus, the defendant must "actively participate[] in [the] criminal venture with full knowledge of the circumstances constituting the charged offense."  Id. at 76-77.

Perkins first argues that there was insufficient evidence presented at trial to support his conviction for kidnapping, either as a principal or as an aider and abetter.  Perkins maintains that the Government was required to prove that he participated in the kidnapping with the purpose and intent of making ransom demands for the victim's release, or with knowledge that the purpose of the kidnapping was to make ransom demands.  As noted above, ransom demands were not made until after Perkins and Favors terminated their involvement in the kidnapping. Thus, Perkins asserts that the Government failed to present any evidence that he knew his codefendants planned to make ransom demands.  According to Perkins, this lack of evidence "left [the jury] to infer that [he] must have known that a ransom demand was to be made."  (ECF. No. 411 at 8).

Although kidnapping is a specific intent crime, it is well-established that the second element of the kidnapping statute—that the victim is held "for ransom or reward or otherwise"—is "interpreted broadly 'to include any object of kidnapping which the perpetrator might consider of sufficient benefit to himself to induce him to undertake it.'"  Rivera, 2023 WL 3294847 at *2 (quoting United States v. Wolford, 444 F.2d 876, 881 (D.C. Cir. 1971)).  Courts have uniformly held that proof of the "for ransom or reward" language in the statute is unnecessary because the word "otherwise" is interpreted to mean any purpose. See, e.g., Gooch v. United States, 297 U.S. 124, 127 (1936) (amendment to kidnapping statute indicated congressional intent that the statute be interpreted broadly to include holding a victim "not only for reward, but for any other reason."); United States v. Parker, 103 F.2d 857 (3d Cir. 1939) ("[w]e think that Congress by the phrase 'or

otherwise' intended to include any object of a kidnapping which the perpetrator might consider of sufficient benefit to himself to induce him to undertake it.").

Given this precedent, the Government was not obligated to prove that Perkins knew the ultimate goal of the kidnapping was to hold the victim for ransom, or that a ransom demand was going to be made. As explained above, courts have reached a consensus that a kidnapper's motivation is not an element of the offense that must be proven. And here, the Government established that Perkins knowingly agreed to help unlawfully hold the victim, and took an affirmative act in furtherance of the offense by helping load the victim into the trunk of the Lincoln Navigator. The evidence also established that the victim was transported across state lines to Maryland, and that he died as a result of the kidnapping. Perkins's motivation for providing assistance did not need to be an eventual ransom demand. Rather, it is sufficient that he believed he would receive a benefit in the form of establishing a drug trafficking relationship with Prieto.

Drawing all reasonable inferences in favor of the jury verdict, I thus conclude that sufficient evidence supported Perkins's conviction for kidnapping and aiding and abetting. Accordingly, Perkins's Motion for Entry of Judgment of Acquittal on Count Two will be denied.[5]

---

[5]     A defendant may also be held vicariously liable for substantive offenses committed by their co-conspirators if: (1) the defendant is a party to a criminal conspiracy, (2) one or more co-conspirators committed the substantive offense in furtherance of the conspiracy, and (3) commission of the substantive offense was reasonably foreseeable. United States v. Whitted, 734 F. Appx. 90, 93 (3d Cir. 2018). This is known as the Pinkerton doctrine. See Pinkerton v. United States, 328 U.S. 640 (1946).
        The Government did not need to rely on Pinkerton liability for the substantive offense of kidnapping, as I have already found that the evidence was sufficient to convict Perkins of aiding and abetting. However, as explained in Section IV.B. infra., when viewed in the light most favorable to the Government, the evidence also showed that Perkins was a member of a conspiracy to kidnap the victim. And even if Perkins was only part of a "drug dealing" conspiracy and did not know that his codefendants planned to kidnap the victim, the substantive crime of kidnapping fell within the scope of the unlawful project and could be reasonably foreseen as a natural consequence of the unlawful agreement. As the Government noted in their brief, multiple witnesses testified that Perkins knew the purpose of Prieto's meeting with the victim was to collect money that the victim owed. Accordingly, even if the Government had been required to prove that Perkins knew a ransom was to be collected, Perkins's conviction for the substantive kidnapping charge would be upheld under Pinkerton.

**B.** **Challenge to the Sufficiency of the Evidence – Conspiracy to Commit Kidnapping (Count One)**

Regarding conspiracy, the Government was required to prove that: (1) an agreement existed between two or more persons to kidnap; (2) the defendant intentionally joined the agreement with knowledge of its objective; and (3) an overt act was taken in furtherance of the conspiracy by one of its members.  United States v. Whiteford, 676 F.3d 348, 356-57 (3d Cir. 2012).  Because "illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract," a conspiratorial agreement can be proven by circumstantial evidence alone.  United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007).  However, "[c]ircumstantial inferences drawn from the evidence must bear a logical or convincing connection to established fact."  United States v. Caraballo-Rodriguez, 726 F.3d 418,425 (3d Cir. 2013) (internal quotations omitted).

Perkins also seeks acquittal on Count One, arguing that the Government failed to establish that he joined a kidnapping conspiracy with knowledge that the goal of the kidnapping was to make ransom demands.  Perkins contends that the evidence demonstrates two separate conspiracies existed – a drug dealing conspiracy between Prieto, Perkins and Favors, and a kidnapping conspiracy between Prieto and the rest of the defendants.  According to Perkins, kidnapping was never discussed during the meeting at the restaurant in Philadelphia, and as such, he did not intentionally enter into an agreement to kidnap the victim with full knowledge of the conspiracy's ultimate objective.

As explained above, the Government was not required to prove that the kidnapping was motivated specifically by a desire to secure a ransom.  Thus, it follows that the Government did not need to prove that Perkins knew his codefendants would make ransom demands.

10

Perkins makes a related argument that the evidence did not demonstrate that he entered into a conspiracy to kidnap the victim – for any reason – because he and his codefendants never explicitly discussed kidnapping during their meeting at the restaurant.  Perkins posits that the evidence connecting him to the kidnapping conspiracy is so slight that a jury would have to "pile inference upon inference" in order to enter a verdict of guilt.  For these reasons, Perkins seeks acquittal on the conspiracy count.

When reviewing challenges to the sufficiency of the evidence in conspiracy cases, the United States Court of Appeals for the Third Circuit has explicitly rejected an approach in which courts "revers[e] the jury's conclusion simply because another inference is possible—or even equally plausible.[]"  United States v. Caraballo-Rodriguez, 726 F.3d 418, 432 (3d Cir. 2013).  The court explained that, under a previous and less deferential standard, courts often improperly examined the evidence under a microscope, effectively acting as a "thirteenth juror."  Id.  at 430.  The Third Circuit clarified however that the appropriate standard for challenges to the sufficiency of the evidence in conspiracy cases is the deferential standard they routinely apply for Rule 29 motions in other criminal cases.  Id.  That is, "the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not fall below the threshold of bare rationality."  Id. at 431.  "While evidence proffered at trial may be consistent with multiple possibilities," the court emphasized that the jury's conclusion must be upheld unless it is "irrational."  Id. at 432.

Several of the cases Perkins cites to support his argument were decided under the old, less deferential standard for challenges to the sufficiency of the evidence in conspiracy cases described above.  United States v. Salmon, 944 F.2d 1106 (3d Cir. 1991) (reversing conviction for conspiracy to possess with intent to distribute cocaine under less deferential standard); United States v.

Wexler, 838 F.2d 88, 92 (3d Cir. 1988) (reversing conviction for conspiracy to distribute hashish because "[t]he evidence is just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime."). Under Caraballo-Rodriguez, district courts can no longer "substitute[] [their] judgment for that of the jury" in this way. Id. at 430.

The stronger cases Perkins cites can be distinguished from the present case. For example, in United States v. Cooper, the Third Circuit reversed the conspiracy conviction of a defendant who traveled cross-country with a co-defendant who was knowingly carrying marijuana in a padlocked rear compartment of his truck. 567 F.2d 252, 255 (3d Cir. 1977). The defendant stayed in a hotel room with his co-defendant and made several phone calls to the co-defendant's home before they began their trip. Id. at 254. The government argued that this evidence alone proved the defendant knew his co-defendant would be transporting marijuana in the truck, making him a member of a conspiracy to transport the marijuana. Id. The Third Circuit reversed the defendant's conviction, finding that "[i]n the absence of some evidence that [the defendant] knew of the contents of the locked compartment or some evidence that he engaged in telephone or other communication of a conspiratorial nature, no factfinder could find beyond a reasonable doubt that [the defendant] was a member of the [conspiracy to transport marijuana]." Id. at 254-55.

Here, unlike in Cooper, there is direct evidence, that a jury chose to accept, of Perkins's agreement to help Prieto and his associates kidnap the victim. Prieto and Bernal testified that they had discussions with Favors and Perkins at the restaurant about "kidnapping" and "picking up" the victim in order to recover the debt he owed to them. Bernal additionally testified that payment for Favors and Perkins's participation was discussed. And Favors testified that Prieto said he wanted to "get that mother f*****," referring to the victim. Favors also testified that he and Perkins knew their role was to act as the "muscle" in case the victim became violent when Prieto demanded

12

repayment.  The evidence also showed that Perkins and Favors believed their participation in the kidnapping would result in a future drug dealing relationship with Prieto.  This evidence could be reasonably relied upon to convict Perkins of conspiracy to commit kidnapping.  Although Perkins points out that the witnesses offered conflicting testimony as to whether the specific word "kidnap" was ever used at the restaurant and Favors testified that neither he nor Perkins were aware that a kidnapping was going to take place, at this stage I must view the evidence in the light most favorable to the Government.  While the jury certainly could have drawn other inferences from the evidence, I am required to draw all inferences in the light most favorable to the prosecution.  Caraballo-Rodriguez, 726 F.3d at 434 ("it is not the business of a reviewing court to play the role of an extra juror in assessing all the possible inferences that could be drawn.") (emphasis in original).

Reviewing the record in this light, including testimony from Prieto, Bernal, and Favors, I conclude that sufficient evidence was presented to establish that Perkins knowingly joined a conspiracy to kidnap the victim in this case.  Therefore, Perkins's Motion for Entry of Judgment of Acquittal on Count One will be denied.

## V.      Conclusion

For the reasons discussed above, I will deny Defendant Perkins's Motion for Judgment of Acquittal.  An appropriate Order follows.